### LAIDLAW v. SAGE.

(Supreme Court, Appellate Division, First Department. March 6, 1896.)

1. INSTRUCTIONS—REPETITION.
    It is proper to refuse an instruction which has already been fully given.
2. SAME—REVIEW.
    In determining the correctness of a charge it should be taken as a whole, and not merely isolated portions thereof.
3. JUROR—COMPETENCY—BIAS.
    A juror on voir dire, after testifying that he would as willingly render a verdict for defendant as for plaintiff, if the evidence warranted it, stated, in answer to a question by defendant's counsel, that he might have some "reluctance" to decide in favor of defendant, because of sympathy. On further examination by the justice the juror testified that he could

render a verdict on the evidence uninfluenced by any consideration, and that by reluctance he did not mean that he would be influenced in rendering his verdict. *Held*, that it was not error to overrule a challenge by defendant for bias.

4. SAME—PREVIOUSLY FORMED OPINION.

In a civil case it is not error to reject a juror testifying that he had formed and expressed an opinion on the case from reading the evidence in former trials, though he also testified that he would not be swayed by such opinions.

5. SAME—BIAS.

It is not reversible error to reject a juror because he was connected with a corporation which manufactured articles for a company of which defendant was a member.

6. EVIDENCE—ADMISSIONS—PROOF OF IDENTITY.

In an action for personal injuries received by plaintiff by reason of being placed by defendant between himself and a dynamite explosion, it appeared that defendant, an elderly man, was taken, after the explosion, to a drug store, to have his injuries, consisting of burns upon the hands, etc., dressed, and sat on a chair in the middle of the floor. *Held*, that testimony of a witness that he heard an elderly man, sitting on a chair in the center of the floor of the store, whose hands were burned and clothes torn by the explosion, state that he had had some protection from the explosion, was sufficient to identify defendant as the man who made the statement, so as to render it admissible against him, especially when the jury was instructed to disregard such statement unless they believed it was made by defendant.

7. WITNESS—CROSS-EXAMINATION—DISCRETION.

It is within the discretion of the trial court to determine how far and to what extent he would allow a witness on cross-examination to be asked questions disparaging to him, and not relevant to the case.

8. APPEAL—REVIEW—EVIDENCE.

In an action for personal injuries alleged to have been caused by reason of defendant's placing plaintiff between himself and a dynamite explosion, plaintiff testified that defendant placed his hand on his arm, and quietly drew him between the dynamiter and himself, so that his body covered defendant, except his right arm and leg. Defendant denied that he had done so; and another witness of the explosion corroborated defendant, though from his position plaintiff and defendant were not all the time within his vision. In the explosion particles of flying matter entered defendant's clothing about the median line. *Held*, that the evidence was sufficient to sustain a finding that defendant placed plaintiff between himself and the explosion.

9. SAME.

In such an action there was evidence that the main force of the explosion was in certain lines of direction; that plaintiff was moved by defendant from a place where he was, without either of the main currents of the explosion, to a place where he was within the full sweep of the currents. *Held*, that the evidence was sufficient to show that plaintiff's injuries were aggravated by his removal.

Appeal from circuit court, New York county.

Action by William R. Laidlaw against Russell Sage. From a judgment for plaintiff, entered after trial at circuit, and from an order denying a motion for a new trial, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, PATTERSON, and O'BRIEN, JJ.

Edward C. James, for appellant.

Noah Davis, for respondent.

PATTERSON, J. We are asked to reverse the judgment appealed from, and to send this cause back for a fifth trial, upon a record containing something over 200 exceptions, applying in various ways to almost everything not in the interest of the defendant said or done by the justice who presided at the last trial. We have carefully examined the whole case, and find there was no error committed of a character or sufficient in gravity to call for the resubmission of the issues to a jury; and that the case is now in such condition that the important question of the liability of the defendant as matter of law may be properly presented to the court of last resort. But it is due to the defendant and his counsel that the reasons which impel us to affirm this judgment should be fully set forth. In former opinions of the general term in this department the rule of decision applicable to this particular case was announced, and compliance with the requirements of that rule by making proof of facts within it is the test of the right of the plaintiff to hold the judgment now appealed from. In the first of the opinions referred to (73 Hun, 125, 25 N. Y. Supp. 955) it was, in substance, declared that causing the plaintiff to change his position by an act intentionally done, whereby the person of the plaintiff was used by the defendant as a shield or protection from an impending or threatened danger, known to the defendant, but of which the plaintiff was ignorant, furnished a ground of action for damages for the injuries the plaintiff sustained. It resulted from this expression of the views of the court that to recover the plaintiff must prove by a preponderance of evidence—First, that the act of aggression was committed; second, that it was done intentionally, and with the design mentioned; and, third, that injury ensued. It was further considered that, the elements referred to being established prima facie, the burden was cast upon the defendant to show that his act did not in any way contribute to any part of the injury, and that it was not incumbent on the plaintiff to prove that his injuries would not have been so great had he not been moved from the position he originally occupied. On the second appeal (80 Hun, 550, 30 N. Y. Supp. 496) the general rule of liability was reasserted; but it was more particularly pointed out that a crucial distinction existed between an act instinctively done, under a natural impulse of self-preservation, and one deliberately done by a man who takes in the whole of the surrounding circumstances, and then "with reason and forethought puts a human buffer between himself and anticipated injury"; the act being voluntary not necessarily making it actionable, but to be so it must have proceeded from calculation and design.

That group of the defendant's exceptions which relates to the law as charged by the trial justice at the last trial may be conveniently examined at this point. The exceptions referred to were taken to portions of what the justice did charge and to parts of what he refused on request to charge. In its general scope and purport the rule of liability as declared by the general term was announced, but in one respect with a radical modification. Instead of adhering to the views of the appellate branch of the court, the

trial judge instructed the jury that the burden of proof was on the plaintiff from the beginning to the end of the case on every issue, thereby compelling the plaintiff to prove that his injuries were greater than those he would have sustained had his position not been changed by the alleged act of the defendant. This ruling, binding as it did the plaintiff to a more rigorous one than was deemed by the general term necessary to the maintenance of the action, is made the subject of an argument which will be considered in another connection. In other respects the charge accords with what the general term had previously held. The jury were told that the action was brought to recover damages alleged to have been sustained in consequence of what, if it happened at all, was technically an assault; that if the defendant placed his hands on the plaintiff, and drew or moved him to a different position from that he previously occupied, that act was an assault. It was submitted as a question of fact whether that was done so as to cause a material change in the plaintiff's position. If the jury found it was not done, they were told the defendant was entitled to the verdict. They were also instructed that if the defendant did move the plaintiff involuntarily—that is to say, without a formed intention to do so—he would not be responsible; and that particular part of the charge was emphasized and illustrated by an example of what constituted an unintentional and involuntary act. The jury were further instructed that Mr. Sage was in no wise responsible for the explosion or its effects, but that they must be satisfied that the plaintiff's injuries resulted from Sage's act. This general outline of the charge shows that it was much more favorable to the defendant than, under the views of the general term, he could have anticipated. With the single exception of the so-called "shifting of the burden of proof," the charge was entirely correct in the main features referred to, and, if there were an error in that particular, it was greatly to the advantage of Mr. Sage. The judge did not charge that a mere technical assault entitled the plaintiff to recover substantial damages. He merely said it gave a right of action, and expressly stated "the question of damages is an entirely different one. For such an assault the damages may be merely nominal," etc.

Exceptions appear in the case to particular phrases and language of the trial judge in charging the jury, and in reply to remarks of counsel made in connection with those exceptions. Wherever the exception appeared to indicate that the instruction to which it referred was obscure or incomplete, or might be construed in a different sense from that intended by the judge, a correction or explanation was given; and we find no material error in anything said by the court concerning those matters. Where reference was made by the court to the testimony of witnesses, it was done with fairness and substantial accuracy. Concerning the defendant's requests to charge and the rulings of the court upon them, we find that most of them, and almost all of the vital ones, were charged in the exact language in which they were presented by counsel. Some requests were modified, and properly so; some were

so multifarious as to justify a refusal to charge them. The fourteenth request is an important one, and embraced all the elements of liability. It was refused only as to form. The court had charged fully and completely, in its own way, every element of that request; and, having done so, was not bound to repeat, parrot-like, the words of counsel, or to reiterate in other forms the clear and pointed instructions already given. Having critically examined the charge and the requests of the defendant and the rulings of the court upon them, we are unable to say that any error by which the jury could have been misled or were wrongly advised is made to appear. By separating certain remarks of the court from their context, and considering them dissociated from antecedent or subsequent utterances, it is easy to·predicate error of what was said; but, taking the charge and instructions and rulings on requests to charge as an entirety, we think the defendant has no just grievance, and no wrong was done him in the submission of the cause by the court to the jury.

Recurring to the earliest stage of the trial, the learned counsel for the defendant insists upon the validity of exceptions taken to the rulings of the court as to the qualifications of jurors. By the Code of Civil Procedure the justice at circuit was the trior of all questions concerning the fitness and competency of jurors, and his determination thereupon is reviewable under exception in the same manner as a decision of an issue of fact. Mr. Putnam was called and examined as to his qualifications for service on the panel. He was evidently an intelligent and discriminating man. In answer to a question put by the defendant's counsel·he stated that he might have some reluctance to decide in favor of the defendant because of sympathy. Thereupon he was challenged "for bias." Prior to the answer referred to, Mr. Putnam had said that he would as willingly render a verdict for the defendant as for the plaintiff, if the evidence warranted it; whereupon the defendant's counsel said, "I am not speaking of the evidence now;" thus plainly putting his subsequent question on an entirely different footing. Then the justice, in order to ascertain exactly what was the state of mind of the proposed juror, and that he might decide the question he was obliged to determine, asked:

"Are you satisfied in your own mind that, disregarding sympathy and everything else, and any reluctance you may have, that you could listen to the testimony of the witnesses here, independent of every other consideration in the world, and render a verdict upon that testimony, uninfluenced by every other consideration? Answer. Entirely so. Question. Reluctance does not mean that it would influence you in rendering your verdict when you come to consider the case. Answer. No, sir."

Without further examination, the defense insisted on the challenge. It was not allowed, and a peremptory challenge was interposed. The ruling of the court was right. Mr. Putnam was a competent person to serve. He was not disqualified either for principal cause or favor, grounds of challenge which still exist in civil cases (Butler v. Railroad Co., 121 N. Y. 112, 24 N. E. 187), although jurors are generally examined in such cases on the supposition

that the provisions of the Code of Criminal Procedure as to actual and implied bias, and the modification of the law as to previously formed or expressed opinions as to criminal charges, furnish a rule applicable to all cases.  Mr. H. C. Furman was called for service, and was rejected by the court, to which the defendant excepted. Mr. Furman swore he had expressed an opinion from reading the evidence in the first case, but it had been somewhat modified by reading the account of the second trial.  He also swore his judgment would not be swayed by any opinion he held or impression he had, but that he then had both an opinion and an impression; which meant, of course, he would enter the jury box with them. He was held to be disqualified.  In civil cases it is enough if the proffered juror has formed or expressed an opinion gathered from statements of parties or from a previous trial (Rogers v. Rogers, 14 Wend. 131), and not merely from current rumor and gossip.  The judge, as trior, could determine the effect of this opinion notwithstanding the declaration of the party examined as to his own state of mind.  The law in that regard has not been changed.  The ability to disregard and throw aside a previously formed or expressed opinion is a modification of the law applying in criminal trials only. It was first introduced by chapter 475, Laws 1872, and subsequently incorporated as part of subdivision 2 of section 376 of the Code of Criminal Procedure.  Another gentleman, Mr. Edward Fisher, was rejected because of his connection with a manufacturing corporation which made parts of instruments used by the Western Union Telegraph Company.  According to the admission of his counsel, Mr. Sage "is one of the Western Union Telegraph Company."  Although Mr. Fisher's statements were such as to make him appear in print qualified to serve, we cannot say that the trial judge, who observed his manner and demeanor, was not justified in concluding as matter of fact that he would not be a fair and impartial juror. No especial reference is necessary to the exceptions relating to Mr. Dohn and Mr. Rockwell.

We are next to consider the errors assigned as having been committed during the progress of the trial, and of these we find that the learned counsel for the defendant lays particular stress upon the admission of the testimony of the witness Baillard, and upon the course counsel was permitted to pursue in the cross-examination of Mr. Sage.  Baillard, who was not called on either of the three preceding trials, testified under objection that after the explosion, and when Mr. Sage was receiving attention in O'Connell's drug store, a man pointed out to him as Mr. Sage said "something about being protected; about a protection that he had had from the explosion."  That this testimony was all-important cannot be questioned.  It was relied upon as an admission by Sage that something had happened to benefit him, or save him from more severe injuries than those he actually sustained, and it was sought to weave it into the fabric of the plaintiff's case by connecting it with the claim that nothing else occurred, or could have occurred, that would have afforded protection, except the very act which Laidlaw alleged was committed by the defendant.  It was strenuously

objected there was no competent evidence that Mr. Sage ever made the remark, or that he was identified as the person who made it if it were made by any one. The witness did not know Mr. Sage, and could not swear from personal knowledge to his identity; but it was not necessary that he should. Identity may be established by circumstantial evidence, and the cases have gone so far as to hold that similarity of name is sufficient to prove it. Hatcher v. Rochelean, 18 N. Y. 86. Did the surrounding circumstances point to Mr. Sage as the person who made the alleged remark? The witness was a medical student. He had heard of the explosion, and went to the drug store. Mr. Sage was pointed out to him by O'Connell or some one else. He describes the person thus pointed out as an elderly man, who had been injured by the explosion. His clothes were torn. He was seated in a chair in the middle of the room (where Mr. Sage did sit). He was looking at his hands (which the evidence shows were badly burned and blistered). From the proven situation, condition of the man who spoke, and all the circumstances, there was enough to go to the jury as showing pointedly that Mr. Sage was the person who spoke. Nevertheless, the character of the testimony and the vagueness of the expression are such that, unless the jury were properly instructed concerning them, we should have much hesitation in sustaining a verdict which might or could have been influenced by it; but the court did so charge in the following words:

"I say to the jury that, unless they are satisfied that Mr. Sage made the remark, then, of course, Mr. Sage is not responsible for it at all, and that under the circumstances they can consider whether the witness sufficiently identified Mr. Sage as the person who made the remark (it was testified that he did sit in the middle of the room), and whether, from all the surrounding circumstances, it was a sufficient identification. Unless they are satisfied Mr. Sage made the remark, they are not to consider the testimony at all."

The animadversions of counsel on this testimony of Baillard proceed upon the assumption that the witness was deposing to identification only by hearsay, viz. the statement of a bystander that Mr. Sage was the person to whom the remark is attributed. This ignores all the corroboration of circumstances which sufficiently pointed to Mr. Sage as the person who spoke. That Baillard was contradicted by Mr. Bragen and Dr. Munn was a matter for the consideration of the jury.

The cross-examination of the defendant was a searching and severe one, during which several incidents occurred, now made the subject of indignant criticism by his counsel. The questions put to Mr. Sage respecting an alleged interview between a third person and Rockwell, a juror not accepted, had nothing to do with the case in any aspect, but it is the merest assumption that they in any way prejudiced the defendant; and so of the inquiries as to the lack of interest Mr. Sage took in Laidlaw's welfare. If these inquiries were not considered proper, objection should have been taken when they were first mentioned, which was not the case with the topic last referred to. All of the objections to the manner of the cross-examination may be disposed of in a word. It was entirely within the discretion of the trial judge to determine how far

and to what extent, for the legitimate purposes of the case, he would allow or disallow questions disparaging to a witness, and not relevant to the issues. In President, etc., v. Loomis, 32 N. Y. 127, it was held that the range of irrelevant inquiry for the purpose even of degrading a witness is subject to the control of the presiding judge, "who was bound to permit such inquiry when it seemed to him, in the exercise of a sound discretion, that it would promote the ends of justice, and to exclude it when it seemed unjust to the witness, and uncalled-for by the circumstances of the case." If the questions on cross-examination were objected to on the specific ground referred to, the court was at liberty, and it was its duty to act in its best judgment, and we cannot say its decision presents a manifest case of abuse or injustice.

Another incident of the cross-examination of Mr. Sage to which objection was taken was the use by counsel of a newspaper cutting, from which many statements of a reporter, stated to be a distant relative of Mr. Sage, were taken as the basis of questions put to the witness. We do not understand that the learned counsel for the defendant contends that his adversary had not the right to use this newspaper report of an alleged interview with Mr. Sage for the purpose of framing questions to ascertain whether he did not make for publication various admissions or statements within a day or two after the explosion took place, and yet that was obviously the purpose with which it was used. The subjects of Mr. Sage's appearance, statements, and declarations shortly after the occurrence were not altogether immaterial, especially in view of the rightful purpose of the examining counsel to test the condition of the memory of the witness. The court limited the examination to the testing of the witness' recollection. The newspaper article was not read, and the extracts that were incorporated in questions put to the witness were trivial and unimportant. So with reference to the questions as to the defendant's supposed wealth and multitudinous occupations. They are not of sufficient consequence to authorize us to send these parties back for another trial. We are not called upon to approve or condemn the course of examination pursued by counsel on either side, but merely to say that we find no legal ground for a reversal of the judgment by reason of any of the matters connected with the cross-examination of Mr. Sage.

We are finally to consider the exceptions to the motions for nonsuit, and the sufficiency of the evidence to sustain the verdict as it is brought up by the appeal from the order denying the motion for a new trial. Bearing in mind what has previously been referred to as the several elements of fact, proof of which was declared by the general term to be essential to a recovery, we have examined the whole record, and with the result that we hold that a case was made out sufficient to go to the jury, and that we should not interfere with the verdict. Concerning the act itself,—the moving of the person of Laidlaw,—he swears to it positively. Mr. Sage as positively denies it. Mr. Robertson, the young man who was one of the greatest sufferers of all, was called to corroborate

Mr. Sage. He was a disinterested witness, and meant to tell the truth; but his testimony is not of the convincing character claimed for it by the defendant. He does say that from the time Mr. Sage began to back away from Norcross until the explosion took place he was able to see both Laidlaw and Sage, and that the latter did not touch or move the former; but in this he must have been greatly mistaken, for from his situation he could not have kept his eyes constantly on Sage and Laidlaw and Norcross, for they were not all in the same range of vision all the time,—that is, from the point at which Robertson stood, which was at the little window in the anteroom partition, through which he saw Sage and Laidlaw at the table. Yet he says that from the moment Norcross backed out of the anteroom, and drew a pistol, he kept his eyes steadfastly upon him, which would, of course, have prevented his constantly keeping Laidlaw and Sage in view. In this point, therefore, the testimony is not so forcible as the defendant claims. Laidlaw testified, in substance, that he walked from the lobby of Mr. Sage's office into the anteroom, passed Mr. Sage, who was in conversation with a person who turned out to be the dynamiter, and took a position about the middle of a small table facing Rector street, and looking out on Trinity Churchyard. Mr. Sage, having read the startling paper Norcross handed him, with admirable nerve and coolness, undertook to temporize with the madman. He saw the situation and the impending horror. He says so himself. There is no disagreement as to what he next did. He walked backward to the angle of the small table nearest Norcross, and took a half-seating position on it. Then Laidlaw says Sage put out his hand, and gently and quietly drew him before him, so that he covered the greater part of Mr. Sage's body, and then the latter spoke the words addressed to Norcross, "If I trust you, why cannot you trust me?" Now, it is incontrovertible that Mr. Sage knew of the danger and Laidlaw did not. Mr. Sage positively denies having put his hands on Laidlaw until after the catastrophe, when he says he helped Laidlaw to arise; and he denies that he ever uttered the words attributed to him. He also says that Laidlaw stood at the very opposite end of the table all the time. Laidlaw further testified that as soon as the words were uttered by Mr. Sage the explosion took place. The respective versions of the two parties were clearly put before the jury, who believed Laidlaw. His testimony, if true, showed the commission of the act, its deliberate character, Sage's knowledge of the threatened danger, and his own ignorance of it; from all which the jury could have inferred, and did infer, that the gentle drawing of the plaintiff before him, without violence, but yet with strength sufficient to induce the plaintiff to yield to it, was done by Mr. Sage with the intent and design of screening his person with the body of the plaintiff. And here it becomes material to consider an argument of the counsel for the defendant, before referred to. The trial judge, disregarding the ruling of the general term, held that it was incumbent upon the plaintiff to prove that his injuries were the result of his removal, and that they were more aggravated than they would have been

had he not been removed; and it is confidently claimed that the case is barren of evidence showing or tending to show those facts. It might be sufficient on this topic to say that it was unnecessary, under the rule of law as laid down by the general term, for the plaintiff to prove as much as the justice at circuit thought requisite; and that, the evidence being sufficient to go to the jury within the rulings of the general term, it is immaterial whether or not the measure of the trial judge's view was filled up by the evidence. But, unless we totally misconceive that evidence, there was some proof that the injuries actually received were caused by the removal of the plaintiff, and that he was more seriously injured than he would have been had he not been interfered with. It is deducible from the testimony of Mr. Reeves, who examined the premises immediately after the explosion took place, that its main force was exerted in two ascertained lines of direction,—one north from the point at which the bag containing the dynamite was dropped, within the range of which were Mr. Sage and Laidlaw, and Norcross, who was blown through the Rector street window, and picked up dead on the highway. The joists that ran at right angles with the Rector street wall were found by Mr. Reeves to be fractured,—fourteen of them entirely destroyed; split from end to end. Again another course was diagonal from a hole made where the bag is supposed to have fallen, northeast across the room, in the direction of Broadway. From the situation of the table it is far from improbable, and it might fairly be inferred, if the jury believed that Laidlaw originally occupied the position in which he swears he first stood, that, had he remained there, he would not have been drawn into either of the main currents of the explosion, and he certainly did get within the sweep of one of them. The case is not, therefore, without some evidence that the grievous injuries Laidlaw sustained resulted from his being moved; nor can it be said that he has not shown some facts from which the legitimate inference might arise that his hurts were aggravated by his removal. It was before the jury, then, by evidence which they believed, that Mr. Sage did move the plaintiff; that he did it with deliberation; that it was with an intent to use him as a screen, and that Laidlaw was injured in consequence. The finding as to deliberation was an inevitable one if the jury believed the rest of Laidlaw's story, for Mr. Sage persistently claimed that he never touched Laidlaw at all, and that, when the explosion happened, Laidlaw was separated from him by the whole length of the table. Mr. Sage does not and will not allow the possibility of his having inadvertently or instinctively touched and moved Laidlaw. He unqualifiedly denies it, and removes that element from the discussion, notwithstanding which the court recognized the possibility that it might have so happened, and charged the jury accordingly.

Another view is presented by the learned counsel for the defendant, under which he claims that the version given by Laidlaw is simply an impossibility, and that the proof is conclusive from circumstances that Laidlaw's body could not have been used as a shield to protect Mr. Sage. Laidlaw stated that when Mr. Sage

moved him he was drawn to a position which covered all Mr. Sage's person except the right arm and leg. Now, it is clear that certain particles or substances of flying material penetrated Mr. Sage's clothing, and entered his body near the median line. The question is asked, How could this have occurred without those particles passing through Laidlaw's body, if he really stood in front of Mr. Sage in the attitude he claims? It is not shown that Laidlaw and Sage were in actual close contact. There was an open space between them;—how wide does not appear, but it must have been some inches at least. It is not inconceivable that, in the titanic whirlwind of the explosion, small, flying fragments may have penetrated Mr. Sage's person through the open space referred to. There is nothing more extraordinary in the incident under consideration than in the circumstance that the force of the explosion blew open a large iron safe, and scattered its contents all about the room. No one can account for the eccentricities of such an occurrence. If there were known and provable unvarying incidents of such phenomenal events, some ascertained physical law, acting uniformly and equally on all such occasions, we might be able to say what was or what was not impossible within the operation of such law; but we have no such guides or criteria. And so also with the burns on Mr. Sage's hand, spoken of by Dr. Munn, and which were severe, and of long continuance without healing. If we could say at what fraction of a second they were inflicted, an argument might be drawn to support the defendant's view; but his hands may have been burned while he was falling, or immediately he fell. It is all a matter of conjecture, and the argument of impossibility cannot be allowed to prevail.

We have thus considered the material points urged by the learned and zealous counsel of the defendant, and repeat that we would not be justified in subjecting these parties again to a retrial of the cause. It is in a better position now than it ever has been for the ultimate judgment of the court of appeals, and we have endeavored to set forth our reasons for affirming the judgment in such a way that it may be reviewed on this record in the light of what we conceive to be the true state of the case as it has been presented to us. In conclusion it is to be said that we do not consider the verdict excessive, under all the circumstances of the case.

The judgment must be affirmed, with costs. All concur.